UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| *In re Clover Health Investments, Corp. Data Breach Litigation.* | Case No. 3:26-cv-01035<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Clyde Homan, Philip Otis, Kenneth Karwoski, Susan Alexander, Gregory Christian, Nancie Weierbach, Sharon J. Cox, Barbara Palermo, and Thomas Griffin ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Defendant Clover Health Investments, Corp. ("Clover Health" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, and/or other related entities. Plaintiffs allege the following on information and belief, except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. Plaintiffs bring this class action against Defendant for its failure to secure and safeguard the sensitive personal information that was entrusted to it.

2. Defendant is a private insurance and technology company that offers Medicare Advantage plans, bundling hospital, medical, and often prescription drug coverage into a single health insurance plan, across 200 counties in 5 states.[1]

[1] *About Us*, CLOVER HEALTH, https://www.cloverhealth.com/about-us/about-clover (last visited Sept. 24, 2026).

3. As such, Defendant stores a litany of highly sensitive personally identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about its clients' patients, Defendant's customers. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. As conceded by Defendant in a July 17, 2026, Form 8-K filed with the Securities and Exchange Commission, Defendant first became aware of the Data Breach on July 4, 2026. Following an internal investigation, the company determined that a threat actor gained access to the accounts of ***three*** employees.

5. It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former customers' PII/PHI.

6. Defendant, as a substantial business, had the resources available to take seriously the obligation to protect Private Information. However, Defendant failed to invest the resources necessary to protect the PII/PHI of Plaintiffs and Class members.

7. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Defendant's failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

8. The actions of Defendant related to this Data Breach are unconscionable. Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully,

recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class Members' PII and PHI was safeguarded, failing to take available steps to prevent unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use.

9. As a result, the PII and PHI of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party—an undoubtedly nefarious third party that seeks to profit from this disclosure by defrauding Plaintiffs and Class Members in the future.

10. Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves, and all others harmed by Defendant's misconduct.

11. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are thus entitled to injunctive and other equitable relief.

12. The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, Defendant's customers' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

13. Plaintiff Clyde Homan is a natural person and a citizen of Hamilton, New Jersey. He is domiciled in New Jersey, where he intends to remain.

14. Plaintiff Kenneth Karwoski is a natural person and a citizen of North Arlington, New Jersey. He is domiciled in New Jersey, where he intends to remain.

15. Plaintiff Philip Otis is a natural person and a citizen of Monroe, New Jersey. He is domiciled in New Jersey, where he intends to remain.

16. Plaintiff Susan Alexander is a natural person and a citizen of East Orange, New Jersey. She is domiciled in New Jersey, where she intends to remain.

17. Plaintiff Gregory Christian is a natural person and a citizen of New Jersey. He is domiciled in New Jersey, where he intends to remain.

18. Plaintiff Sharon J. Cox is a natural person and a citizen of New Jersey. She is domiciled in New Jersey, where she intends to remain.

19. Plaintiff Barbara Palermo is a natural person and a citizen of New Jersey. She is domiciled in New Jersey, where she intends to remain.

20. Plaintiff Nancie Weierbach is a natural person and a citizen of Williamstown, New Jersey. She is domiciled in New Jersey, where she intends to remain.

21. Plaintiff Thomas Griffin is a natural person and a citizen of Denville, New Jersey. He is domiciled in New Jersey, where he intends to remain.

22. At all times material hereto, Defendant is and was a Delaware corporation. Defendant is authorized to transact and regularly transacts business in the State of Tennessee, with its principal place of business in the State of Tennessee.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs and Defendant are citizens of different states. And there are over 100 putative Class Members.

24. This Court has personal jurisdiction over Defendant because it is headquartered in Tennessee, regularly conducts business in Tennessee, and has sufficient minimum contacts in Tennessee.

25. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

***Defendant Collected and Stored the PII/PHI of Plaintiffs and the Class***

26. Defendant is a health insurance and technology company that offers Medicare Advantage plans across 200 counties in 5 states.[2]

27. Plaintiffs and the rest of the Class members received Defendant's services, and, in so doing, entrusted Defendant with their extremely sensitive and highly valuable Private Information, which Defendant acquired from Plaintiffs and the other Class members in the course of providing services to them.

28. In collecting and maintaining its clients patients, i.e., Defendant's customers', PII/PHI, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII/PHI.

29. Indeed, in turning over their PII/PHI, Plaintiffs and the Class had a reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

30. Plaintiffs and Class Members relied on Defendant to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

[2] *Id.*

31. Under state and federal law, businesses like Defendant not only have duties to protect its customers' PII/PHI, but also to notify them about breaches.

32. Defendant recognizes these duties, declaring in its "Notice of Privacy Practices" that:

a. "You also have the right to receive notice that a breach has resulted in your unsecured private information being inappropriately used or disclosed. We will notify you in a timely manner, consistent with applicable law, if such a breach occurs."[3]

b. "After the required legal retention period, we destroy the information following strict procedures to maintain its confidentiality."[4]

c. "We support your right to protect the privacy of your medical information."[5]

***Defendant's Data Breach***

33. On or around July 4, 2026, Defendant first became aware that it had been hacked in the Data Breach.[6] On information and belief, the cyberattack resulted in the Data Breach, including the breach and/or compromise of certain files containing the PII/PHI of Plaintiffs and at least tens of thousands of other individuals.

---

[3] *Notice of Privacy Practices*, CLOVER HEALTH, https://cdn.cloverhealth.com/filer_cloudrun_public/filer_public/ba/c3/bac3cdd1-2086-48fa-b5bd-9674ce44d860/26mx034_2026_notice_of_privacy_practices_v2_508.pdf (last visited July 23, 2026).

[4] *Id.*

[5] *Id.*

[6] Clover Health Investments, Corp., Current Report (Form 8-K) (July 4, 2026), https://www.sec.gov/Archives/edgar/data/1801170/000180117026000181/clov-20260704.htm

34. Because of Defendant's Data Breach, at least the following types of PII/PHI may have been compromised:

a. Name;

b. Date of birth;

c. Social Security number;

d. Member visit-scheduling;

e. Broker-facing sales information;

f. Health information; and

g. Health insurance information.

35. On information and belief, the PII/PHI compromised, including Plaintiffs' and the Class's PII/PHI, was not encrypted. In any event, the cybercriminals were able to access the PII/PHI listed above.

36. Worryingly, Defendant admitted in its July 17, 2026, SEC Form 8-K Report that:

a. "The [Data Breach] investigation subsequently showed that a threat actor gained access to three non-managerial health plan employee accounts through social engineering."[7]

b. "The employee accounts had access to certain personally identifiable information and protected health information."[8]

37. Despite the severity of this Breach, upon information and belief, Defendant does not have mailing information for all individuals who are victims of the Data Breach. Thus, on information and belief, formal notice of this Breach to Defendant's customers has not yet begun.

---

[7] *Id.*
[8] *Id.*

38. Defendant continues to keep the Class in the dark, depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

39. The access and/or acquisition of the PII/PHI from Defendant's systems demonstrates that this cyberattack was targeted due to Defendant's status as a business that houses sensitive PII/PHI. Armed with this PII/PHI, data thieves (as well as downstream purchasers of the stolen PII/PHI) can commit a variety of crimes, including as follows: opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' identification information, obtaining driver's licenses in Class members' names but with different photographs, and giving false information to police during any arrests.

40. Despite widespread knowledge of the dangers of identity theft and fraud associated with cyberattacks and unauthorized disclosure of PII/PHI, and despite Defendant's large operating budget, Defendant maintained unreasonably deficient protections prior to the Data Breach; including but not limited to a lack of security measures for storing and handling PII/PHI, as well as inadequate employee training regarding how to access, oversee the protection of, and handle and safeguard this sensitive set of information.

41. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, Defendant caused widespread injury and monetary damages. Plaintiffs and Class members now face a present, substantial, and imminent risk of fraud and identity theft and must deal with that threat forever.

42. Defendant failed to ensure that all personnel with access to Plaintiffs' and Class members' PII/PHI were properly trained in retrieving, handling, using, and distributing sensitive

information. Defendant's personnel were also not properly trained to apply relevant updates and software patches.

43. Since the Data Breach, Defendant claims that it "takes the privacy and security of its member data very seriously and has taken," assuming that it "continues to take, steps to further harden its IT environment."[9]

44. But such simple declarations are insufficient to ensure that Plaintiffs' and Class Members' PII/PHI will be protected from additional exposure in a subsequent data breach.

45. Further, the SEC Report shows that Defendant cannot—or will not—determine the full scope of the Data Breach, as Defendant has been unable to determine precisely what information was stolen and when. Indeed, Defendant has yet to begin formal individual notice to its victims at the time of this complaint.

46. Because of Defendant's Data Breach, the sensitive PII/PHI of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

***The Data Breach Was Foreseeable***

47. Defendant has weighty obligations created by industry standards, common law, and its own promises and representations to keep PII/PHI confidential and to protect PII/PHI from unauthorized access and disclosure.

48. Plaintiffs and Class members provided their PII/PHI to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

---

[9] *Id.*

49. Defendant's data security obligations were particularly acute given the substantial increase in hacks, malware threats, ransomware attacks, and/or other data breaches in various industries, including the industry in which Defendant provides services to individuals, preceding the date of the Data Breach.

50. Defendant was aware of the risk of data breaches because such breaches have dominated the headlines in recent years.

51. Sensitive information, like the PII/PHI targeted by the hackers in this Action, is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used in a variety of unlawful manners. PII/PHI can be used to distinguish, identify, or trace an individual's identity. This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as the information compromised in the Data Breach.

52. Given the nature of the Data Breach, it is foreseeable that the compromised PII/PHI can now be used by hackers and cybercriminals in a variety of different and harmful ways.

53. Cybercriminals who possess Plaintiffs' and Class members' PII/PHI can (either in isolation or in tandem with other information) obtain Plaintiffs' and Class members' tax returns or open fraudulent credit cards or other types of accounts in Plaintiffs' and Class members' names.

54. The increase in such attacks, and attendant risk of future attacks, was widely known.

55. As such, this Data Breach was foreseeable. Defendant was cognizant of the huge risk of data breaches because of how common and high-profile data breaches have become with respect to businesses that have custody of PII/PHI, such as Defendant.

***Plaintiff Homan's Experiences and Injuries***

56. Plaintiff Clyde Homan is a former Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Homan provided Clover Health with his PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Homan and required Plaintiff Homan to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Homan's PII/PHI.

57. As a result of Defendant's Data Breach, Plaintiff Homan was injured.

58. Plaintiff Homan is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

59. Plaintiff Homan provided his PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Homan's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

60. Plaintiff Homan reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

61. Plaintiff Homan does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

62. On information and belief, Plaintiff Homan's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

63. Plaintiff Homan has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

64. Plaintiff Homan fears for his personal financial security and worries about what information was exposed in the Data Breach.

65. Because of Defendant's Data Breach, Plaintiff Homan has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Homan's injuries are precisely the type of injuries that the law contemplates and addresses.

66. Plaintiff Homan suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

67. Plaintiff Homan suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

68. Plaintiff Homan suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Homan's PII/PHI right in the hands of criminals.

69. Because of the Data Breach, Plaintiff Homan anticipates spending considerable amounts of time and money to try to mitigate his injuries.

70. Indeed, Plaintiff Homan has *already* suffered from identity theft and fraud. Specifically, shortly after the Breach, Plaintiff Homan experienced billing system issues on his debit card and was forced to cancel this card and request a new one. On information and belief, this debit card, which Plaintiff Homan used to purchase his oxygen tanks and which Defendant maintains for Plaintiff Homan, was exposed during the breach, resulting in the billing issue he experienced.

71. Also in the aftermath of the Data Breach, Plaintiff Homan suffered from a spike in spam and scam text messages and phone calls that, on information and belief, is the same phone number that Defendant maintains for Plaintiff Homan.

72. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Homan's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[10] On information and belief, the spam texts and calls are a result of the Data Breach.

73. Today, Plaintiff Homan has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Karwoski's Experiences and Injuries***

74. Plaintiff Kenneth Karwoski is a current Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Karwoski provided Clover Health with his PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Karwoski and required Plaintiff Karwoski to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Karwoski's PII/PHI.

75. As a result of Defendant's Data Breach, Plaintiff Karwoski was injured.

76. Plaintiff Karwoski is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

[10] *What do Hackers do with Stolen Information*, Aura, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last accessed Sept. 24, 2026).

77. Plaintiff Karwoski provided his PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Karwoski's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

78. Plaintiff Karwoski reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

79. Plaintiff Karwoski does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

80. On information and belief, Plaintiff Karwoski's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

81. Plaintiff Karwoski has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

82. Plaintiff Karwoski fears for his personal financial security and worries about what information was exposed in the Data Breach.

83. Because of Defendant's Data Breach, Plaintiff Karwoski has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Karwoski's injuries are precisely the type of injuries that the law contemplates and addresses.

84. Plaintiff Karwoski suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

85. Plaintiff Karwoski suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

86. Plaintiff Karwoski suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Karwoski's PII/PHI right in the hands of criminals.

87. Because of the Data Breach, Plaintiff Karwoski anticipates spending considerable amounts of time and money to try to mitigate his injuries.

88. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Karwoski's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[11]

89. Today, Plaintiff Karwoski has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Otis' Experiences and Injuries***

90. Plaintiff Philip Otis is a current Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Otis provided Clover Health with his PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Otis and required Plaintiff Otis to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Otis's PII/PHI.

91. As a result of Defendant's Data Breach, Plaintiff Otis was injured.

[11] *Id.*

92. Plaintiff Otis is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

93. Plaintiff Otis provided his PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Otis's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

94. Plaintiff Otis reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

95. On information and belief, Plaintiff Otis's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

96. Plaintiff Otis has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

97. Plaintiff Otis fears for his personal financial security and worries about what information was exposed in the Data Breach.

98. Because of Defendant's Data Breach, Plaintiff Otis has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Otis's injuries are precisely the type of injuries that the law contemplates and addresses.

99. Plaintiff Otis suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

100. Plaintiff Otis suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

101. Plaintiff Otis suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Otis's PII/PHI right in the hands of criminals.

102. Because of the Data Breach, Plaintiff Otis anticipates spending considerable amounts of time and money to try to mitigate his injuries.

103. Indeed, Plaintiff Otis has *already* suffered from identity theft and fraud. Following the Breach, Plaintiff Otis has begun receiving PayPal scam emails claiming that Plaintiff Otis has payments to make, in an attempt to solicit additional financial information from Plaintiff Otis. Plaintiff Otis has also begun experiencing an increase in spam calls.

104. On information and belief, these spam calls and PayPal spam emails are on the same phone number and email address Defendant maintains for Plaintiff Otis and that was exposed during the Breach.

105. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Otis's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[12] On information and belief, the spam texts and emails are a result of the Data Breach.

106. Today, Plaintiff Otis has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

---

[12] *Id.*

***Plaintiff Christian's Experiences and Injuries***

107. Plaintiff Gregory Christian is a current Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Christian provided Clover Health with his PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Christian and required Plaintiff Christian to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Christian's PII/PHI.

108. As a result of Defendant's Data Breach, Plaintiff Christian was injured.

109. Plaintiff Christian is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

110. Plaintiff Christian provided his PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Christian's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

111. Plaintiff Christian reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

112. Plaintiff Christian does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

113. On information and belief, Plaintiff Christian's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

114. Plaintiff Christian has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

115. Plaintiff Christian fears for his personal financial security and worries about what information was exposed in the Data Breach.

116. Because of Defendant's Data Breach, Plaintiff Christian has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Christian's injuries are precisely the type of injuries that the law contemplates and addresses.

117. Plaintiff Christian suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

118. Plaintiff Christian suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

119. Plaintiff Christian suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Christian's PII/PHI right in the hands of criminals.

120. Because of the Data Breach, Plaintiff Christian anticipates spending considerable amounts of time and money to try to mitigate his injuries.

121. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Christian's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[13]

122. Today, Plaintiff Christian has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

---

[13] *Id.*

***Plaintiff Alexander's Experiences and Injuries***

123. Plaintiff Susan Alexander is a current Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Alexander provided Clover Health with her PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Alexander and required Plaintiff Alexander to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Alexander's PII/PHI.

124. Through its Data Breach, Defendant compromised Plaintiff Alexander's PII/PHI. As a result, Plaintiff Alexander was injured by Defendant's Data Breach.

125. Plaintiff Alexander is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

126. Plaintiff Alexander provided her PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Alexander's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

127. Plaintiff Alexander reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

128. Plaintiff Alexander does not recall ever learning that her information was compromised in a data breach incident—other than the Data Breach at issue here.

129. Thus, on information and belief, Plaintiff Alexander's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

130. Plaintiff Alexander has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

131. Plaintiff Alexander fears for her personal financial security and worries about what information was exposed in the Data Breach.

132. Because of Defendant's Data Breach, Plaintiff Alexander has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Alexander's injuries are precisely the type of injuries that the law contemplates and addresses.

133. Plaintiff Alexander suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

134. Plaintiff Alexander suffered actual injury in the form of damages to and diminution in the value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

135. Plaintiff Alexander suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Alexander's PII/PHI right in the hands of criminals.

136. Because of the Data Breach, Plaintiff Alexander anticipates spending considerable amounts of time and money to try to mitigate her injuries.

137. Indeed, Plaintiff Alexander has *already* suffered from identity theft and fraud. Specifically, shortly after the Breach, Plaintiff Alexander experienced several suspicious charges on her debit card that she did not recognize and certainly did not authorize. This debit card is the same card she received from Defendant as part of her membership with the LiveHealthy Rewards

Program and, on information and belief, was exposed during Defendant's Breach. As a result of these charges, Plaintiff Alexander had to cancel and replace her debit card.

138. More recently, on or around September 23, 2026, Plaintiff Alexander has also experienced suspicious calls and a text message from someone claiming to work for Defendant. This phone number appeared to have the Clover Health name on the Caller ID. This person claimed that Plaintiff Alexander's doctor had sent an order for a scan in January 2026. This person tried to convince Plaintiff Alexander into scheduling this scan and incentivized her with a gift card.

139. Plaintiff Alexander did not agree to anything and did not provide any information, and Plaintiff Alexander then contacted Clover afterwards. Upon speaking to the Clover employees, Plaintiff Alexander discovered that there was no record that the first caller was a Clover employee, and that Clover did not have any record of this employee calling or of the order from Plaintiff Alexander's doctor. Plaintiff Alexander then called her doctor's office who confirmed that they did not place an order for a scan.

140. Plaintiff Alexander then looked up this person's phone number online and believes that this number appeared to belong to an individual located in Houston, Texas.

141. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Alexander's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[14] On information and belief, Plaintiff Alexander's debit card that she received through Defendant's LiveHealthy Rewards Program was compromised as a result of the Breach.

---

[14] *Id.*

142. Today, Plaintiff Alexander has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Weierbach's Experiences and Injuries***

143. Plaintiff Nancie Weierbach is a current Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Weierbach provided Clover Health with her PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Weierbach and required Plaintiff Weierbach to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Weierbach's PII/PHI.

144. Through its Data Breach, Defendant compromised Plaintiff Weierbach's PII/PHI. As a result, Plaintiff Weierbach was injured by Defendant's Data Breach.

145. Plaintiff Weierbach is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

146. Plaintiff Weierbach provided her PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Weierbach's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

147. Plaintiff Weierbach reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

148. Plaintiff does not recall ever learning that her information was compromised in a data breach incident—other than the Data Breach at issue here.

149. Thus, on information and belief, Plaintiff Weierbach's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

150. Plaintiff Weierbach has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

151. Plaintiff Weierbach fears for her personal financial security and worries about what information was exposed in the Data Breach.

152. Because of Defendant's Data Breach, Plaintiff Weierbach has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Weierbach's injuries are precisely the type of injuries that the law contemplates and addresses.

153. Plaintiff Weierbach suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

154. Plaintiff Weierbach suffered actual injury in the form of damages to and diminution in the value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

155. Plaintiff Weierbach suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Weierbach's PII/PHI right in the hands of criminals.

156. Because of the Data Breach, Plaintiff Weierbach anticipates spending considerable amounts of time and money to try to mitigate her injuries.

157. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Weierbach's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[15]

158. Since the Data Breach occurred, Plaintiff Weierbach has already begun experiencing misuse of her PII/PHI. Around August of 2026, Plaintiff Weierbach was receiving an unusual number of communications from her bank, Columbia Bank – New Jersey, where the bank was declining her attempted purchases on her debit card. Plaintiff Weierbach subsequently called her bank, and she was informed that an unauthorized individual had attempted various fraudulent charges using her debit card, specifically, that an approximately $414 charge for AirPods in California and other charges for stereo equipment were attempted. Her bank promptly deactivated her debit card and issued her a new one, froze her bank account, and advised her to open a new bank account. Plaintiff Weierbach then opened a new bank account as a result. Additionally, since the Data Breach occurred, Plaintiff Weierbach has experienced a significant uptick in spam calls, texts, and emails. The spam communications often attempt to get Plaintiff Weierbach to click on suspicious links, attempt to get Plaintiff Weierbach to verify sensitive information about herself, advertise products or services, or threaten her about unpaid debts that she does not actually owe. Because of the timing of these suspicious activities and the Data Breach, and because Plaintiff Weierbach provided Defendant with significant PII/PHI including her contact information and financial account information, Plaintiff Weierbach believes that the suspicious activities are a result of criminals acquiring her PII/PHI in the Data Breach.

---

[15] *Id.*

159. Today, Plaintiff Weierbach has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Cox's Experiences and Injuries***

160. Plaintiff Sharon Cox is a current Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Cox provided Clover Health with her PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Cox and required Plaintiff Cox to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Cox's PII/PHI.

161. Through its Data Breach, Defendant compromised Plaintiff Cox's PII/PHI. As a result, Plaintiff Cox was injured by Defendant's Data Breach.

162. Plaintiff Cox is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

163. Plaintiff Cox provided her PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Cox's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

164. Plaintiff Cox reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

165. Plaintiff Cox does not recall ever learning that her information was compromised in a data breach incident—other than the Data Breach at issue here.

166. Thus, on information and belief, Plaintiff Cox's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

167. Plaintiff Cox has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

168. Plaintiff Cox fears for her personal financial security and worries about what information was exposed in the Data Breach.

169. Because of Defendant's Data Breach, Plaintiff Cox has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Cox's injuries are precisely the type of injuries that the law contemplates and addresses.

170. Plaintiff Cox suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

171. Plaintiff Cox suffered actual injury in the form of damages to and diminution in the value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

172. Plaintiff Cox suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Cox's PII/PHI right in the hands of criminals.

173. Because of the Data Breach, Plaintiff Cox anticipates spending considerable amounts of time and money to try to mitigate her injuries.

174. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Cox's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[16]

175. Today, Plaintiff Cox has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Palermo's Experiences and Injuries***

176. Plaintiff Barbara Palermo is a current Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Palermo provided Clover Health with her PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Palermo and required Plaintiff Palermo to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Palermo's PII/PHI.

177. As a result, Plaintiff Palermo was injured by Defendant's Data Breach.

178. Plaintiff Palermo is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

179. Plaintiff Palermo provided her PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Palermo's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

---

[16] *Id.*


Case 3:26-cv-01035 Document 17 Filed 09/25/26 Page 28 of 70 PageID #: 149

180. Plaintiff Palermo reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

181. Plaintiff Palermo does not recall ever learning that her information was compromised in a data breach incident—other than the Data Breach at issue here.

182. Thus, on information and belief, Plaintiff Palermo's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

183. Plaintiff Palermo has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

184. Plaintiff Palermo fears for her personal financial security and worries about what information was exposed in the Data Breach.

185. Because of Defendant's Data Breach, Plaintiff Palermo has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Palermo's injuries are precisely the type of injuries that the law contemplates and addresses.

186. Plaintiff Palermo suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

187. Plaintiff Palermo suffered actual injury in the form of damages to and diminution in the value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

188. Plaintiff Palermo suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Palermo's PII/PHI right in the hands of criminals.

189. Because of the Data Breach, Plaintiff Palermo anticipates spending considerable amounts of time and money to try to mitigate her injuries.

190. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Palermo's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[17]

191. Today, Plaintiff Palermo has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Griffin's Experiences and Injuries***

192. Plaintiff Thomas Griffin is a current Clover Health customer. As a condition of receiving services from Clover Health, Plaintiff Griffin provided Clover Health with his PII/PHI. Clover Health used that PII/PHI to facilitate its services to Plaintiff Griffin and required Plaintiff Griffin to provide that PII/PHI to obtain its services. Thus, Defendant obtained and maintained Plaintiff Griffin's PII/PHI.

193. As a result of Defendant's Data Breach, Plaintiff Griffin was injured.

194. Plaintiff Griffin is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

195. Plaintiff Griffin provided his PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Griffin's PII/PHI and has

---

[17] *Id.*

a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

196. Plaintiff Griffin reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

197. Plaintiff Griffin does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

198. On information and belief, Plaintiff Griffin's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

199. Plaintiff Griffin has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

200. Plaintiff Griffin fears for his personal financial security and worries about what information was exposed in the Data Breach.

201. Because of Defendant's Data Breach, Plaintiff Griffin has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Griffin's injuries are precisely the type of injuries that the law contemplates and addresses.

202. Plaintiff Griffin suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

203. Plaintiff Griffin suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

204. Plaintiff Griffin suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Griffin's PII/PHI right in the hands of criminals.

205. Because of the Data Breach, Plaintiff Griffin anticipates spending considerable amounts of time and money to try to mitigate his injuries.

206. Once an individual's PII/PHI is for sale and accessible on the dark web, as Plaintiff Griffin's PII/PHI is here because of the Breach, cybercriminals can use the stolen and compromised data to gather and steal even more information.[18]

207. Today, Plaintiff Griffin has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Data Breaches Are Harmful and Disruptive***

208. The United States Government Accountability Office ("GAO") released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

209. That is because all victims of a data breach may be exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII/PHI is to monetize it because there is (unfortunately) a market for PII/PHI, like the PII/PHI compromised by the Data Breach.

210. Cybercriminals do this by selling the spoils of their cyberattacks on the illegal market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a

[18] *Id.*

person's identity is akin to a puzzle, the greater number of accurate individual pieces of data an identity thief obtains regarding a person, the easier it is for that thief to take on the victim's identity, or otherwise to harass or track the victim.

211. For example, armed with only a name and a Social Security number, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information regarding a victim's identity, such as a person's login credentials. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls, deceptive text messages, and phishing emails.

212. Because of the threat of these harms, the FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach such as the Data Breach at issue here, including contacting one of the credit bureaus to place a fraud alert (and potentially obtaining an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, purchasing credit monitoring, and correcting their credit reports.

213. Theft of PII/PHI is gravely serious. PII/PHI is an extremely valuable property right.

214. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates that PII/PHI has considerable market value.

215. According to the GAO:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that

> information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

216. PII/PHI, such as the PII/PHI compromised in the Data Breach, is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. The private information of individuals remains of high value to criminals, as evidenced by the prices paid through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, certain sets of private information can be sold at a price from $40 to $200. Social Security numbers, which were compromised in this Data Breach, are particularly valuable. Clearly, all this data has real value – which is why it is often targeted and stolen in the first place.

217. Because the PII/PHI compromised in the Data Breach is at substantial risk of being disclosed on the dark web, Plaintiffs and Class members are at a substantial imminent risk of injury, including an increased risk of fraud and identity theft for many years into the future.

218. Thus, Plaintiffs and Class members must vigilantly monitor their financial accounts and other indicators of identity theft (*e.g.*, the mail, email, etc.) for many years to come.

219. Plaintiffs and Class members suffered actual injury from having their PII/PHI compromised as a result of the Data Breach, including, but not limited to, as follows: (a) misuse of their compromised PII/PHI; (b) damage to and diminution in the value of their PII/PHI, a form of property that Defendant obtained from Plaintiffs and Class members; (c) violation of their privacy, including the compromise of highly sensitive PII/PHI; (d) present, imminent, and

impending injury arising from the increased risk of identity theft and fraud; and (e) actual and potential out-of-pocket losses, including the loss of time and the loss of money.

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

220. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII/PHI is used;

b. diminution in value of their PII/PHI;

c. compromise and continuing publication of their PII/PHI;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII/PHI; and

h. continued risk to their PII/PHI—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the PII/PHI.

***Plaintiffs Now Face Substantially Increased Risk of Identity Theft and Fraud***

221. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

222. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

223. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

224. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

225. The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[19] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[20] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

226. The unencrypted PII/PHI of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and

[19] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).
[20] *Id*.

detailed PII/PHI may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII/PHI.

227. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

228. In particular, the theft of Social Security numbers—in combination with other PII/PHI (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

229. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[21] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[22]

230. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected

---

[21] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[22] *Id*.

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

231. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[23]

232. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

233. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

234. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

---

[23] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

235. Identity thieves can also use an individual's personal data and PII/PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant issued in the victim's name.[24]

236. One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[25] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII/PHI with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

---

[24] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[25] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

237. The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

238. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[26]

239. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII/PHI was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

[26] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

240. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

241. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll that identity theft can take, some victims must also spend a considerable time repairing the damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

242. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII/PHI. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

243. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

244. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[27]

245. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have

---

[27] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

lesser IT defenses and a high incentive to regain access to their data quickly."[28]

246. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks.[29]

247. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

248. Furthermore, Data breaches are preventable.[30] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[31]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[32]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be

---

[28] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[29] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Sept. 24, 2026).

[30] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

[31] *Id.* at 17.

[32] *Id.* at 28.

implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [33]

***Consumers Prioritize Data Security***

249. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[34] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[35]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[36]

c. 89% of consumers stated that "I care about data privacy."[37]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[38]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[39]

---

[33] *Id.*
[34] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Sept. 24, 2026).
[35] *Id*. at 3.
[36] *Id*.
[37] *Id*. at 9.
[38] *Id*.
[39] *Id*.

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[40]

***Defendant Failed to Follow FTC Guidelines***

250. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

251. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[41] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

252. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

253. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

---

[40] *Id*. at 11.

[41] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

254. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

255. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its patients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

256. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

257. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers;

monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

258. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

259. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

***Defendant Violated HIPAA***

260. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' and customers' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[42]

---

[42] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

261. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[43]

262. The Data Breach resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

---

[43] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

263. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

264. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach discovered by Clover Health in July 2026, including all those individuals who received notice of the Data Breach.

265. Excluded from the Class are Defendant, its affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

266. Plaintiffs reserve the right to amend the class definition.

267. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

268. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

269. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least hundreds of members.

270. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

271. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

272. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class-wide proceeding can answer for all Class Members. In fact, a class-wide proceeding is necessary to answer the following questions:

a. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII/PHI;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant was negligent in maintaining, protecting, and securing PII/PHI;

d. Whether Defendant breached contract promises to safeguard Plaintiffs and the Class's PII/PHI;

e. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. Whether Defendant's Breach Notice was reasonable;

g. Whether the Data Breach caused Plaintiffs and the Class injuries;

h. What the proper damages measure is; and

i. Whether Plaintiffs and the Class are entitled to damages, treble damages, and/or injunctive relief.

273. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of

scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Gross Negligence**
**(On Behalf of Plaintiffs and the Class)**

274. Plaintiffs repeat and reallege paragraphs 1-272 above as if fully set forth herein.

275. Plaintiffs and the Class entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

276. Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' PII/PHI, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

277. Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

278. Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

279. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class Members' PII/PHI.

280. Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII/PHI in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII/PHI.

281. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

282. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

283. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

284. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendant with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

285. Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class Members' PHI.

286. Defendant violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

287. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendant holds vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII/PHI —whether by malware or otherwise.

288. PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, storing, and the importance of exercising reasonable care in the handling of the PII/PHI of Plaintiffs and Class Members.

289. Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiffs and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

290. Defendant breached these duties as evidenced by the Data Breach.

291. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII/PHI by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

292. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiffs and Class Members, which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

293. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

294. Defendant has/have admitted that the PII/PHI of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

295. The specific reckless and grossly negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' PII/PHI;

b. Failing to adequately monitor the security of its networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information;

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards; and

d. Failing to detect the breach at the time it began or within a reasonable time thereafter;

e. Failing to follow its own privacy policies and practices published to its customers.

296. Defendant's conduct went far beyond ordinary negligence. Defendant acted with gross negligence by consciously and recklessly disregarding known risks to Plaintiffs' PII/PHI, including by failing to implement basic and industry-standard cybersecurity measures, failing to adequately monitor its systems for unauthorized access, failing to remediate known security vulnerabilities, failing to properly train employees on data security, and failing to timely detect and prevent the Data Breach. Defendant knew or should have known that its inadequate data-security practices created a high probability of harm to Plaintiffs and the Class, yet Defendant consciously failed to take reasonable steps to prevent that harm.

297. Defendant's grossly negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiffs and the Class. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiffs and the Class, whose sensitive personal information Defendant was entrusted to protect.

298. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI obtained and stored, and the foreseeable consequences of a data breach on Defendant's systems.

299. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

300. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

301. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual,

tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

302. Plaintiffs repeat and reallege paragraphs 1-272 above as if fully set forth herein.

303. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII/PHI.

304. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' sensitive PII/PHI.

305. Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII/PHI.

306. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a data

breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

307. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

308. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

309. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII/PHI.

310. Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class Members' PHI.

311. Defendant violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

312. Defendant's various violations and its failure to comply with applicable laws and regulations constitute negligence *per se*.

313. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

314. Plaintiffs repeat and reallege paragraphs 1-272 above as if fully set forth herein.

315. Plaintiffs and Class Members were required to provide their PII/PHI to Defendant as a condition of receiving services provided by Defendant. Plaintiffs and Class Members provided their PII/PHI to Defendant or its third-party agents in exchange for Defendant's services.

316. Plaintiffs and Class Members reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

317. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

318. Plaintiffs and the Class Members accepted Defendant's offers by disclosing their PII/PHI to Defendant or its third-party agents in exchange for services.

319. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII/PHI to unauthorized persons.

320. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiffs' and Class Members' PII/PHI.

321. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

322. After all, Plaintiffs and Class Members would not have entrusted their PII/PHI to Defendant in the absence of such an agreement with Defendant.

323. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

324. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

325. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

326. Defendant materially breached the contracts it entered with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information;

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendant created, received, maintained, and transmitted.

327. In these and other ways, Defendant violated its duty of good faith and fair dealing.

328. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

329. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

330. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

331. Plaintiffs repeat and reallege paragraphs 1-272 above as if fully set forth herein.

332. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

333. Plaintiffs and Class Members successfully took reasonable and appropriate steps to keep their PII/PHI confidential from the public.

334. Defendant owed a duty to its current and former patients, including Plaintiffs and the Class, to keep this information confidential.

335. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' PII/PHI is highly offensive to a reasonable person.

336. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected

from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

337. Defendant's conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals—individuals in a special relationship with Plaintiffs and the proposed Class in that they are the exact group from whom the expected cybersecurity measures are intended to protect Plaintiffs and the proposed Class.

338. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

339. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

340. Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

341. By intentionally failing to keep Plaintiffs' and Class Members' PII/PHI safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiffs' and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiffs' and Class Members' private affairs in a manner that identifies Plaintiffs and Class Members and that would be highly offensive and objectionable to an ordinary person;

b. Intentionally publicizing private facts about Plaintiffs and Class Members, which is highly offensive and objectionable to an ordinary person; and

c. Intentionally causing anguish or suffering to Plaintiffs and Class Members.

342. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of

Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." Id. cmt. B.

343. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiffs' privacy.

344. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

345. As a proximate result of Defendant's acts and omissions, the private and sensitive PII/PHI of Plaintiffs and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed supra).

346. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

347. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII/PHI are still maintained by Defendant with its inadequate cybersecurity system and policies.

348. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiffs and the Class.

349. In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

350. Plaintiffs repeat and reallege paragraphs 1-272 above as if fully set forth herein.

351. This claim is pleaded in the alternative to the breach of implied contract claim.

352. Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII/PHI to provide services, and (2) accepting payment.

353. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

354. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

355. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII/PHI.

356. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

357. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII/PHI and (2) payment because Defendant failed to adequately protect their PII/PHI.

358. Plaintiffs and Class Members have no adequate remedy at law.

359. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## SIXTH CAUSE OF ACTION
## Breach of Fiduciary Duty
## (On Behalf of Plaintiffs and the Class)

360. Plaintiffs repeat and reallege paragraphs 1-272 above as if fully set forth herein.

361. Given the relationship between Defendant and Plaintiffs and Class Members, where Defendant became guardian of Plaintiffs' and Class Members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' PII/PHI; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

362. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

363. Because of the highly sensitive nature of the PII/PHI, Plaintiffs and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

364. Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII/PHI.

365. Defendant also breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

366. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

367. Plaintiffs repeat and reallege paragraphs 1-272 above as if fully set forth herein.

368. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

369. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendant's actions were—and still are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

370. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to protect the data entrusted to it; and

d. Defendant's breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

371. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

372. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

373. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

374. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

375. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Date: September 25, 2026

Respectfully submitted,

*/s/ Grayson Wells*
Grayson Wells (BPR # 039658)

J. Gerard Stranch, IV (BPR #23045)
Darrius Dixon (BPR #040462)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com
ddixon@stranchlaw.com

Israel David*
Adam M. Harris*
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, New York 10004
Tel: (212) 350-8850
israel.david@davidllc.com
adam.harris@davidllc.com

Mark A. Cianci*
**ISRAEL DAVID LLC**
399 Boylston Street, Floor 6, Suite 23
Boston, Massachusetts 02116
Tel: (617) 295-7771
mark.cianci@davidllc.com
Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Tel: (215) 559-6072
klaukaitis@laukaitislaw.com

Samuel J. Strauss*
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Tel: (872) 263-1100
F: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Jeff Ostrow*
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 332-4200
ostrow@kolawyers.com

***Pro hac vice* forthcoming**

***Attorneys for Plaintiffs and the Proposed Class***

## CERTIFICATE OF SERVICE

I certify that on September 25, 2026, a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the Court, which will send notice of electronic filing to all counsel of record and sent by certified mail to the following:

Clover Health Investments, Corp.
c/o CT Corporation System
300 Montvue Road
Knoxville, TN 37919

*/s/Grayson Wells*
Grayson Wells (BPR # 039658)